# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| In Re the Marriage of: | No. 54806-2-II |
| MICHAEL B. GITRE, | |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| SUMITA KAY GITRE, | |
| Appellant. | |

WORSWICK, J. — Sumita Gitre appeals the parenting plan, child support order, relocation order, and final divorce order entered on dissolution of her marriage with Michael Gitre.[1] Sumita also appeals the trial court's denial of her motion to hold Michael in contempt for violating a temporary parenting plan. Sumita has a history of mental illness and Michael has a history of domestic violence based on stalking. The trial court named Michael the sole decision-maker and primary custodian for the children. However, the trial court did not enter adequate findings to support its decision to name Michael the primary parent as required under RCW 26.09.191. Accordingly, we affirm in part but reverse and remand the parenting plan and associated child support order and relocation order for proper consideration of the parents' performance and residential time consistent with our instructions below.

---

[1] For clarity, we refer to the parties by their first names. No disrespect is intended.

FACTS

## I.  BACKGROUND

Sumita and Michael married in 2009.  The couple initially lived in Arizona but moved to Washington in 2010.  They had two sons:  DG, born in 2011, and JG born in 2014.

Michael previously filed for divorce in May 2014.  That same year, Child Protective Services (CPS) entered a dependency action for the two children based on a fight between Sumita and Michael and Sumita's mental health.  The children were placed in foster care.  The couple put the divorce on hold during the dependency, and those proceedings were dismissed in 2015.  CPS returned the children to Sumita in September 2015, around which time Sumita and Michael reconciled.  The dependency was dismissed in November 2015.  A third son, RG, was born in 2018.

Michael petitioned for divorce again in May 2019.

## II.  SUMITA'S MENTAL HEALTH

Over the course of the relationship, Sumita struggled with mental health and substance abuse.  Sumita was hospitalized multiple times for her mental health.  She was involuntarily committed in Arizona around 2007 and diagnosed with bipolar disorder.  She was arrested and charged with possession of narcotics in November 2008.

In April 2014, Sumita was at a hotel when she locked herself in the bathroom, started screaming, and broke glass all over the floor.  She claimed there were bombs in the building and cut her hands and feet on the broken glass.  She was then involuntarily hospitalized on a

psychiatric hold for at least five days.[2] In May, Sumita was arrested and charged with driving under the influence and ultimately convicted of reckless driving. She was subsequently hospitalized and received treatment for a head wound and mental health.

Sumita was most recently hospitalized in April 2019 after Michael received a call from police informing him that Sumita was spotted in a woman's backyard, confused and disheveled.[3] She had become lost off-trail, wandering in the woods with RG, the youngest son, who would have been approximately one year old. Michael learned Sumita had lost her belongings, and he later found her wallet, purse, and baby bag in a creek bed near where she emerged from the woods. Sumita was subsequently hospitalized for six days. During that hospitalization, Sumita was diagnosed with a bipolar disorder, post-traumatic stress disorder (PTSD), anxiety, and a manic behavior personality disorder.

A.    *Dr. Singer Report*

Sumita then contacted two psychologists to assess her mental health. In December 2019, Dr. William Singer evaluated Sumita. He conducted psychological screenings and reviewed her medical history.

Dr. Singer reported that during Sumita's 2019 hospitalization she reported that she had previously been diagnosed as bipolar. She was manic for a week and required restraints and medication during her 2019 hospitalization. Dr. Singer noted that in 2008 "[p]hysician notes relate that she had spent over $1,000 on transportation (in Arizona), hurt her pet cat, and lost 10

---

[2] It appears that CPS initiated the dependency action at this time.

[3] Sumita apparently knocked on the woman's back door and the woman called the police. The Police then called Michael.

pounds in 2 weeks, wearing inappropriate clothing in public and not showering." Exhibit (Ex.) 192-018. Her medical record shows that at some point she admitted to doing meth and tested positive for meth, cocaine, opiates, and cannabis. When she was hospitalized in 2014, Sumita suffered from delusions. Regarding being discovered in the woods, Dr. Singer noted that Sumita reported that it was part of a "plan to escape" that went wrong. Ex. 192-019.

Dr. Singer explained:

> There are a number of other incidents in [Sumita]'s medical history that are of record which clearly demonstrate an acute, episodic Bipolar events with psychotic processes. It is also clear that these episodes were triggered during times when [Sumita] was not compliant with taking her prescriptive medications. [Sumita], (of record), admittedly had stopped taking her medications at her election.

Ex. 192-019.

Dr. Singer then recommended that Sumita engage in reunification therapy with her children, noting that "[t]here has been damage to the consortium of [Sumita] and children by deprivation of a healthy maternal involvement." Ex. 192-024. Finally, Dr. Singer recommended that "[Sumita] participate in a weekly mental health treatment program for a minimum duration of 18 months, complete abstinence of alcohol and any non-prescriptive substances and medication management by a licensed psychiatrist." Ex. 192-026.

B. *Dr. Smetko Report*

Next, in January 2020, Dr. Paul Smetko conducted another evaluation at Sumita's request. Dr. Smetko based his report on interviews with Sumita, a conversation with her regular psychotherapist, and an evaluation of Dr. Singer's report and the documents Dr. Singer had access to.

Dr. Smetko echoed Dr. Singer's findings. Dr. Smetko noted "ample evidence of serious mental health breakdowns" and stated, "If this [is] a bipolar process, then it needs consistent treatment and support." Ex. 193-003 at 6 (MG-5360). Dr. Smetko explained:

> The question of [Sumita]'s capacity and stability at this time is easily answered. She is stable and capable at this time. Both parents work and require supports during their parenting time. Is Sumita vulnerable to relapse and a repeated melt down? Yes, she is as would anyone with a psychiatric history such as hers. However, this can be managed with proper psychotherapy, proper medication and a willingness to work on one['s] self. Removing the daily stress of a volatile relationship will go a long way toward supporting the above.

Ex. 193-003 at 8 (MG-5362).

> Dr. Smetko concluded:

> It is not my role to make custodial recommendations. However, I can say that Sumita Gitre is currently stable and able to be a regular parental presence in her children's lives. I can say that her children need regular and consistent contact with her and that the current arrangement is inadequate to those needs. As long as Sumita does the above and the marriage is appropriately resolved with a good parenting plan, the children are currently safe with their mother. Social supports as determined by the court should be maintained for the present.

Ex. 193-003 at 9 (MG-5363).

### III. MICHAEL'S DOMESTIC VIOLENCE AND NO-CONTACT ORDERS

In April 2014, during the time of their first separation, Sumita obtained a domestic violence no-contact order against Michael, based on stalking. In June, Michael violated the no-contact order when he approached the residence where Sumita was staying and set off her car alarm using a key fob that was in his possession. Michael pled guilty to committing an offense

5

against a household member under RCW 10.99.020. The superior court reinstated the no-contact order following his guilty plea.[4]

A.      *Temporary Parenting Plan*

In May 2019, Michael petitioned for divorce, and Sumita responded requesting a protection order and restraining order based on domestic violence or harassment.[5] In June, the trial court entered a temporary family law order. In the temporary order, the court approved Sumita's request for a restraining order against Michael and stated that the earlier protection order "remains unchanged." Ex. 350 at 3. The court found "that this appears to be a repeat of the events of 2014 between the parties. Further, the court is concerned by the pattern by [Michael] of stalking, not just [Sumita] but of others."[6] Ex. 350 at 1.

In the temporary order, the court appointed a guardian ad litem (GAL) to investigate and report on issues affecting the children, ordered the children to continue residing with [Michael] at the family home, and gave Sumita visits with the children on certain days. The court also ordered exchanges of the children to be conducted by a third party for [Michael]. In February

---

[4] The status of this no-contact order is unclear from the record on appeal, given that Michael and Sumita reconciled and moved back in together in 2015.

[5] In her response, Sumita also noted that she already had a protection order against Michael.

[6] The temporary order also states:

> The court likewise finds concerns about [Sumita's] current mental health and allegations of abuse and control in home. The court finds that [Sumita's] 2014 psychological evaluation did not diagnose her with bi-polar disorder. Rather, she was diagnosed with PTSD and anxiety, of which certain phases would mimic bi-polar. The court does not know how much of [Sumita]'s behavior is attributable to [Michael].

Ex. 350 at 1.

2020, the court modified the temporary order to state that "[a] neutral third party shall be used for exchanges of the children. This person shall not be permitted to testify in court or be a witness to proceedings." Ex. 366 at 1 (pdf at 349). Finally, the court ordered Michael to undergo a domestic violence assessment with a parenting component.

B.      *Domestic Violence Assessment*

Between October and December, licensed mental health and certified domestic violence (DV) therapist PJ Eaton conducted a DV evaluation on Michael. As part of the assessment, Michael completed DV and anger management assessments, child abuse potential and parent-child relationship inventories, multiple interviews with Eaton, and Eaton interviewed Sumita and observed Michael with the children. Eaton reviewed Michael's criminal history, including his 2014 no-contact order and subsequent violation, as well as a 2009 DUI.

Eaton concluded that Michael has a low propensity for initiating or engaging in abusive behaviors. However, Eaton noted that "[t]here appears to have been controlling behaviors by [Michael] as related to mental health concerns of [Sumita]." Ex. 163-009 at 8. Eaton explained that "[t]here appears to be no indicators that [Michael] presents a safety issue for his children as supported by collateral contacts, documents and testing." Ex. 163-013 at 12. Eaton noted that "concrete evidence of an on-going pattern of domestic violence was not determined" and concluded that "[d]omestic violence treatment is not being recommended at this time." Ex. 163-013 at 12-13.

IV. GUARDIAN AD LITEM REPORT

The court-appointed GAL issued a report in May 2020. The GAL interviewed the parties, other contacts including teachers, reviewed law enforcement documents, Dr. Singer's and Dr. Smetko's reports on Sumita, Eaton's DV evaluation on Michael, and other documents.

Sumita reported to the GAL that she was living in confidential DV housing and attributed her PTSD to Michael's abuse. The GAL called Sumita's mental health and behaviors areas of "grave concern." Clerk's Papers (CP) at 52. Michael denied any child abuse to the GAL and submitted reports from the Department of Social and Health Services that stated there was insufficient evidence to substantiate reports of abuse against him. The two children were old enough to converse and did not "endorse[] claims of physical discipline or anything which led to concerns about physical abuse." CP at 53. The GAL echoed the findings from Dr. Singer's report and Eaton's DV evaluation.

The GAL explained that "[Sumita]'s mental health and conduct when in crisis remain a significant concern to this GAL." CP at 61. Quoting Dr. Singer's report, the GAL observed that when Sumita is not taking her prescribed medication she "becomes homicidal, delusional and possibly suicidal." CP at 61. However, the GAL concluded that "nothing leads me to conclude that either parents' current environment is a danger to the children." CP at 61.

The GAL recommended the following, in pertinent part, as in the children's best interests:

> 1. [Michael] should be identified as the primary residential parent. Of the two parents, [Michael] appears the more stable parent with the ability to care and provide for the children. He has consistently cared for the children and taken steps to ensure that they are safe and in a healthy environment. School officials and other

neutral providers (all mandated providers) have uniformly indicated that [Michael] is the parent who has met the needs of the children consistently since this case was filed.

2. Given the nature of the parties' relationship, it is unlikely joint-decision making will be successful. Therefore, I recommend that [Michael] have sole-decision making as to educational and medical decisions with notice of all important issues provided to [Sumita] within 24 hours or as soon as practical.

3. [Sumita] should [spend] significantly more time with the children, PROVIDED she continues to comply with her medication management protocols and remains stable. In this regard, I recommend that for four months after the entry of the final parenting plan, [Sumita] should be required to file monthly reports with the Court and [Michael] to show that she is in compliance with her counseling and that she continues to take her prescribed medications. . . .

CP at 62.

## V. PROCEDURAL HISTORY

The case proceeded to trial in July 2020. The court admitted Dr. Singer's and Dr. Smetko's reports, Eaton's DV evaluation, and the GAL report. At trial, Sumita, Michael, and the GAL testified as above. Neither Dr. Singer nor Dr. Smetko testified.

### A. *Dr. Rybicki Report*

Sumita contracted with Dr. Daniel Rybicki to conduct a "work product review" and critique the Dr. Singer, Dr. Smetko, and GAL reports. Verbatim Report of Proceedings (VRP) (July 17, 2020) at 8. Sumita added Dr. Rybicki to her amended witness list shortly before trial. Sumita stated that Dr. Rybicki was to complete a "thorough review of [Sumita's] mental health evaluation" but her counsel admitted that "Dr. Rybicki is not here to conduct a whole nother [sic] investigation." CP at 114; VRP (July 17, 2020) at 8.

Dr. Rybicki reviewed the GAL report as well as the Dr. Singer and Dr. Smetko reports but did not interview any of the parties, any witnesses, or conduct any evaluations. Dr. Rybicki

offered no opinion on what was in the children's best interest. Instead, he critiqued that the GAL did not give enough weight to Michael's history of DV and criticized the GAL's recommendation that Michael be the primary decision-maker. Dr. Rybicki likewise criticized Dr. Singer's and Dr. Smetko's methods, but offered no opinion on child placement.

Dr. Rybicki concluded:

Finally, it should be understood that I have not met with any of the parties nor have I conducted my own psychological assessment with any of the parties. None of the comments made here should be understood as diagnoses or clinical findings regarding any of the parties. None of these statements should be taken as case specific recommendations regarding best interest concerns or offering advice regarding custody or visitation.

CP at 73.

Michael filed a motion in limine to exclude Dr. Rybicki's report and testimony. Michael argued that Dr. Rybicki's opinions lacked a reliable foundation and were irrelevant. He further argued that Dr. Rybicki's report, and any testimony he could offer, were speculative and "no help to the factfinder." CP at 225.

The trial court granted Michael's motion to exclude Dr. Rybicki's report and testimony. The trial court found that Dr. Rybicki did not review all relevant records in the case, only those provided by Sumita. The court further found that Dr. Rybicki did not request any information from Michael, conduct any interviews or psychological examinations, and offered no expert opinions. The court concluded:

The court finds that Dr. Rybicki was only retained for a critique and work product review of the GAL . . . and [Sumita's] own mental health professionals Dr. Singer and Dr. Smetko. In this way he interferes with the responsibility of the fact finder to access expertise and credibility.

> . . . The court finds Dr. Rybicki has no expert opinions as to any material issue in this case. Therefore, his report and testimony would not be helpful to the court as the factfinder. ER 702, ER 401, ER 402, and ER 403.

CP at 352.

B.      *Contempt Motion*

Ten days before trial, Sumita filed a motion for contempt against Michael for allegedly failing to deliver the children to Sumita under the terms of the temporary parenting plan for the planned July 11 exchange. The court heard testimony on the issue during trial.

Chad Gallup testified that Sumita asked him to assist her with picking up the children on one of her scheduled days because she could not find anyone else.[7] Gallup testified that he showed up at the exchange location but did not see Michael, so he texted him. Gallup's first text read, "I've been at the Fife Police Station for almost 20 minutes waiting for you to arrive with the kids to get Sumita. What is your ETA?" VRP (July 29, 2020) at 149. To this, Michael responded, "Who is this?" VRP (July 29, 2020) at 149.

Michael testified that Sumita had called the police on him over 22 times in order to get him arrested for a violation of the no-contact order. He further testified that Sumita appeared in person at the two prior exchanges, despite the February order modifying the temporary parenting plan that required each parent to use a third party to exchange the children. Michael testified that when he received the text from Gallup he did not know who he was. Michael testified that he therefore did not want to take the children to where Sumita might be to give her the opportunity

---

[7] Chad Gallup is Sumita's trial counsel's spouse. Gallup was involved in the exchange notwithstanding the court's order that the parents use a neutral third party to exchange the children and that the person not be permitted to testify in court or be a witness to proceedings.

to call police on him: "I'm not going to just walk into a trap to get arrested. Thank you." VRP (July 30, 2020) at 436-38.

The court found that Michael did not obey the temporary parenting plan because he did not deliver the children as planned. However, the court also found that Michael did not act in bad faith because "he acted to protect his children and his rights not to be set up for a violation." CP at 602. Accordingly, the court found Michael was not in contempt.

C. *Findings and Conclusions About the Marriage and Parenting Plan*

The trial court made no oral findings. In the parenting plan, under section 3, "[r]easons for putting limitations on a parent" under RCW 26.09.191,[8] the court found, "Neither parent has any of these problems." CP at 476. However, under "[o]ther problems that may harm the children's best interests" the court found the following:

> Emotional or physical problem – Sumita Gitre has a long-term emotional or physical problem (mental health condition) that gets in the way of her ability to parent.
>
> Substance Abuse – has a long-term problem with drugs, alcohol, or other substances that gets in the way of his/her ability to parent.

CP at 476-77. The court did not include a name under "substance abuse."

The court placed limitations on Sumita requiring she receive mental health treatment and abstain from alcohol and marijuana when parenting the children. It placed no limitations on Michael.

---

[8] The parenting plan form describing the RCW 26.09.191 conditions lists abandonment, neglect, child abuse, domestic violence, assault, or sex offense. The form states: "If a parent has any of these problems, the court *must* limit that parent's contact with the children, the right to make decisions for the children, and may not require dispute resolution other than court." CP at 476.

The court named Michael the sole decision-maker. The court also named Michael the primary parent, with varying schedules depending on how far Sumita lived from Michael and the children. "Within the same school district etc.: The children are scheduled to reside with the parents equally on a week-on/week-off residential schedule, provided the children have the same care provider when they are not in school and the parents are working." CP at 479. However, the court ruled that if Sumita lives farther away, then on reaching 14 years old, each child may choose to skip weekends or holidays with Sumita "that interfere with the child's extracurricular activities or peer friendship plans." CP at 479. At trial, the court asked the parties if they agreed that "the children make their own decisions as they mature. Does that work for everybody?" VRP (July 30, 2020) at 527. To this, both parties responded in the affirmative and the court stated, "Everybody is nodding positive." VRP (July 30, 2020) at 527.

Under the "findings of fact" section of the parenting plan the court stated: "The Court adopts the statements in section 3 (reasons for putting limitations on a parent) as its findings." CP at 485. The court also entered a child support order, findings and conclusions about a marriage, and a final divorce order.

Michael also filed a Notice of Intent to Move with Children. He stated his plan to relocate with the children to the Phoenix, Arizona area. Sumita objected. In its final order and findings about the objection and petition, the court listed the following under "[f]actors for/against move with children"

> The children shall move with their primary parent [Michael] who has sole decision-making.
>
> Factors:
> a. Relationships: The children's relationships with each parent, any siblings, and other important people in the children's life have been impacted by [Sumita]'s

13

mental health disturbances, beginning April 2014 after the birth of the parties' second son, and again beginning April 2019 after the birth of the parties' third son. [Michael] is seeking to return to the parties' former home in the Phoenix, Arizona area where the children will have closer relationships with paternal and maternal grandparents and with paternal aunts, uncles and cousins. This factor weighs in favor of relocation.

b. Agreements: *Findings:* There were not agreements between the relocating and objecting persons about moving with the children per say [*sic*], although both parties testified that they contemplated moving "home" to Phoenix in the future. [Sumita] testified she could not move as she has just re-entered the workforce and believes she would have trouble if she moved so soon after obtaining a very good position in her former field of property management. This factor very slightly weighs in favor of [Michael].

c. Contact: *Findings:* Disrupting the children's contact with the objecting person would not be more harmful to them than disrupting their contact with the relocating person. [Sumita] never requested to be a primary parent with the majority of residential time with her children. She testified that her mental health was now under control as she had had time and energy to properly treat and care for herself during the temporary plan of supervised no overnight visits from May 2019 to just before trial in late July 2020. [Sumita]'s testimony was that she should have equal parenting time with [Michael] and [Michael] should not be permitted to move. [Sumita] blamed her mental health breakdown to the stress of being a stay at home parent with all the responsibilities while [Michael] did nothing to help with the children. Placing the children primarily with [Sumita] was not an option presented to the court. The court has concerns whether [Sumita] as primary parent could safely parent the children. This factor weighs in favor of [Michael] who has accepted and shown successful full time parenting of all three children.

d. Limitations: *Findings:* The current parenting/custody order decided in connection herewith, includes two limitations under RCW 26.09.191 on [Sumita] for long term physical condition of her mental health and for her continuous use of alcohol despite a history of DUI, intensive alcohol treatment and mental health concerns which include [Sumita]'s inability to understand a mental health trigger for her is belief that she can safely use alcohol. This factor weighs heavily in favor of relocation.

e. Reasons for moving: *Findings:* There is no dispute but that reasons for moving were given in good faith. [Michael] anticipates a promotion at work that will involve more travel than presently. He has ascertained that this situation will exacerbate current challenges of working while being a primary parent of three children. He desires to move to obtain extended family support for his children.

14

f. Reasons for objecting: *Findings:* The reasons for objecting to the move were given in good faith.

g. Children: *Findings:* Preventing the move would affect the children's physical, educational, and emotional development, considering their age, developmental stage, and needs (including any special needs) as follows:
If move is allowed, the children will have additional resources not only from [Michael]'s promotion but also from extended family as caregivers and support. [Sumita]'s participation would be by her testimony be limited to half time which would cause the children to deal with two household and potentially two different sets of caregivers, one set in each household while each parent worked. This would be difficult for [DG] whose special IEP needs are better served by consistency not a week on and week off schedule absent the parents living in very close proximity. During covid if schools for the older two boys were not in person, a split plan could work, but due to the distance between the parties' residences, one parent could not reasonably bring the children to school and still timely attend to his or her work duties. This factor weighs for [Michael]'s move.

h. Quality of life: The quality of life, resources, and opportunities available to the children and the relocating person in the current location and in the new location. *Findings:* Phoenix and Seattle and surrounds are comparable. Neither outweighs the other.

i. Other arrangements: Other arrangements available to foster and continue the objecting person's relationship and contact with the children.
*Findings:* There would be arrangements available as Phoenix and Seattle and surrounds have same amenities in communication and in travel availability.

j. Alternatives: Alternatives to the planned move, and whether it is possible or desirable for the objecting person to move too.
*Findings:* [Sumita] indicates moving to Phoenix was in future plans and the inability she perceives to her move now are temporary in scope. [Sumita] had a career in property management in the Phoenix area. This weighs slightly in favor of the move.

k. Financial: The financial impact and logistics of moving or not moving (for example, the timing, cost, and how the move would happen).
*Findings:* The court can devise a plan to give [Sumita] significant time with the children before [Michael] moves, helping them re-establish[] a relationship that was interrupted for about fourteen months. The court can also devise a plan for significant visits approximating the desired half time, whether [Sumita] is within the same school district, from one to five hours distant or long distance.

CP at 507-09.

15

The court granted Michael's request to relocate and reiterated that Michael was the primary parent. Sumita appeals.

ANALYSIS

Across 27 assignments of error, Sumita argues that (1) the trial court erred when it did not limit Michael's residential time based on DV under RCW 26.09.191,[9] (2) the trial court erred when it excluded Dr. Rybicki's testimony, (3) the trial court did not properly weigh the relocation factors under RCW 26.09.520, (4) the trial court erred when it assigned Michael as the sole decision-maker for the children, and (5) the trial court erred when it permitted the children to determine how to exercise their residential time after reaching age 14. Sumita further argues that (6) the trial court abused its discretion when it did not find Michael in contempt for failure to comply with the temporary parenting schedule, and (7) she is entitled to attorney fees on appeal.

We hold that (1) the trial court did not enter proper findings under RCW 26.09.191. (2) We further hold that the trial court did not err when it excluded Dr. Rybicki's testimony; however, the trial court may reconsider whether Dr. Rybicki's report or testimony will be helpful on remand. The trial court's insufficient findings in the parenting plan by extension impact (3) the relocation order and (4) sole-decision-maker determination. As for (5) the court's decision to permit the children to choose which parent to live with after age 14, the parties agreed to this at trial and Sumita's argument fails as invited error. Finally, we hold that (6) the trial court did not abuse its discretion when it did not find Michael in contempt and (7) we do not award attorney fees.

---

[9] The Family Violence Appellate Project filed an amicus brief in support of Sumita on this topic.

I. STANDARD OF REVIEW

The trial court has broad discretion in developing a parenting plan. *In re Marriage of Katare*, 175 Wn.2d 23, 35, 283 P.3d 546 (2012). The trial court must wield this discretion in the best interest of the children and only after considering the factors identified in RCW 26.09.187(3). *In re Parentage of J.H.*, 112 Wn. App. 486, 492-93, 49 P.3d 154 (2002). RCW 26.09.187(3)(a) provides that "[t]he court shall make residential provisions for each child which encourage each parent to maintain a loving, stable, and nurturing relationship with the child, consistent with the child's developmental level and the family's social and economic circumstances."

We review a trial court's parenting plan for an abuse of discretion. *In re Marriage of Black*, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017). A trial court abuses its discretion when its decision is manifestly unreasonable, based on untenable grounds or reasons, or the trial court misapplies the law. *Black*, 188 Wn.2d at 127; *Muridan v. Redl*, 3 Wn. App. 2d 44, 54, 413 P.3d 1072 (2018).

> A trial court's decision is manifestly unreasonable if it is outside the range of acceptable choices considering the facts and applicable legal standard, it is based on untenable grounds if the factual findings are not supported by the record, and it is based on untenable reasons if it applies an incorrect standard or the facts do not meet the requirements of the correct standard.

*In re Parenting of L.H.*, 198 Wn. App. 190, 194, 391 P.3d 490 (2016). We determine whether a trial court's findings of fact are supported by substantial evidence. *Black*, 188 Wn.2d at 127. We do not reweigh the evidence to determine if we would reach a different conclusion from the trial court. *In re Marriage of McNaught*, 189 Wn. App. 545, 561, 359 P.3d 811 (2015).

## II. RESIDENTIAL TIME LIMIT UNDER RCW 26.09.191

A.      *Trial Court's Findings of Fact Under RCW 26.09.191*

As an initial matter, Sumita argues that the evidence does not support the trial court's

finding of fact under the parenting plan section for section .191 restrictions (which include

"abandonment, neglect, child abuse, domestic violence, assault, or sex offense") that "[n]either

parent has any of these problems." CP at 476; Br. of Appellant at 17-18. We agree.

RCW 26.09.191(2)(a) provides, in pertinent part:

> The parent's residential time with the child shall be limited if it is found that the
> parent has engaged in any of the following conduct: . . . (iii) a history of acts of
> domestic violence as defined in RCW 26.50.010(3) or an assault or sexual assault
> that causes grievous bodily harm or the fear of such harm or that results in a
> pregnancy. . . .

Under RCW 26.50.010(3)(b), "domestic violence" includes "stalking as defined in RCW

9A.46.110 of one family or household member by another family or household member."

Likewise, stalking under RCW 9A.46.110 and violation of a no contact order are included in the

definition of "domestic violence" under the criminal code, RCW 10.99.020.

Here, it is clear from the record that Michael had DV problems requiring a finding under

RCW 26.09.191. In April 2014, Sumita obtained a DV no-contact order against Michael, based

on stalking. In June 2014, Michael violated the no-contact order when he approached the

residence where Sumita was staying and set off her car alarm using a key fob that was in his

possession. Michael pled guilty to committing an offense against a household member under

RCW 10.99.020. The superior court reinstated the no-contact order following his guilty plea.

Thus, the trial court's finding of fact that "[n]either parent" has a history of domestic

violence is not supported by the record. CP at 476. Because the finding of fact is not supported

by the record, it is based on untenable grounds. *L.H.*, 198 Wn. App. at 194. Accordingly, we hold that the trial court abused its discretion when it did not enter adequate findings regarding Michael's history of DV under RCW 26.09.191(2)(a).

B. *Limitations on a Parent*

Sumita and the amicus argue that the trial court erred when it failed to limit Michael's residential time under RCW 26.09.191 due to his history of DV. As explained above, we hold that the trial court failed to enter adequate findings on Michael's past DV as required under RCW 26.09.191. However, although the record shows that Michael has a history of DV based on stalking and violating no-contact orders, it also is apparent that Sumita has mental health diagnoses that could negatively impact her parenting ability. Thus both parties had engaged in conduct that triggered the restrictions of RCW 26.09.191. But here the trial court failed to enter findings and conclusions adequate to allow us to determine the trial court's reasons for reaching its conclusion and naming Michael the primary residential parent.

As explained above, a "parent's residential time with the child shall be limited if it is found that the parent has engaged in . . . a history of acts of domestic violence." RCW 26.09.191(2)(a)(iii). Such restrictions are mandatory. *In re Wagner*, 18 Wn. App. 2d 588, 595, 496 P.3d 742 (2021). As shown above, Michael has a history of DV.

However, under RCW 26.09.191(2)(n), the court need not limit residential time under -.191(2)(a) if it makes additional express findings related to the impact of the parent's conduct on the children and the children's best interests. *Wagner*, 18 Wn. App. 2d at 595.

> If the court expressly finds based on the evidence that contact between the parent and the child will not cause physical, sexual, or emotional abuse or harm to the child and that the probability that the parent's or other person's harmful or abusive conduct will recur is so remote that it would not be in the child's best interests to

apply the limitations of [(2)](a) . . . of this subsection, or if the court expressly finds that the parent's conduct did not have an impact on the child, then the court need not apply the limitations of (a) . . . of this subsection. The weight given to the existence of a protection order issued under chapter 26.50 RCW as to domestic violence is within the discretion of the court. . . .

RCW 26.09.191(2)(n).

Additionally, the court may impose discretionary limitations under RCW 26.09.191(3).

*Wagner*, 18 Wn. App. 2d at 596. Relevant here,

A parent's involvement or conduct may have an adverse effect on the child's best interests, and the court may preclude or limit any provisions of the parenting plan, if any of the following factors exist: . . . A long-term emotional or physical impairment which interferes with the parent's performance of parenting functions as defined in RCW 26.09.004.[10]

RCW 26.09.191(3)(b).

Because of the trial court's scant findings, it is impossible to determine whether it properly applied the statute when it named Michael the primary residential parent and sole decision-maker. The statute provides for a court to use its discretion to grant a parent with a history of DV unrestricted access to his or her children. RCW 26.09.191(2)(n). But to do so, the trial court must make additional *express* findings that the parent's history or conduct will not or has not negatively impacted the children. RCW 26.09.191(2)(n). The court did not do so here. Instead, under the parenting plan section for section .191 restrictions, the trial court entered only, "Neither parent has any of these problems." CP at 476. Given the substantial record and potential problems each parent here has, these findings are inadequate to support the trial court's conclusion that Michael should have unrestricted residential time.

---

[10] RCW 26.09.004 defines "parenting functions" as "those aspects of the parent-child relationship in which the parent makes decisions and performs functions necessary for the care and growth of the child."

Likewise, RCW 26.09.191(3)(b) provides a way for the trial court to limit a parent's residential time if he or she displays long-term mental health problems. The statute gives the trial court discretion to impose restrictions on a parent with an emotional impairment that impacts his or her parenting abilities. Under this section of the parenting plan the trial court entered slightly more specific findings:

> Emotional or physical problem – Sumita Gitre has a long-term emotional or physical problem (mental health condition) that gets in the way of her ability to parent.

> Substance Abuse – has a long-term problem with drugs, alcohol, or other substances that gets in the way of his/her ability to parent.

CP at 477.

The court noted that Sumita displayed a long-term mental health condition but it did not enter sufficient findings for this determination to control its conclusions in the parenting plan. Despite Sumita's history of drug and alcohol problems, the court failed to enter a name under the substance abuse finding. Thus, although the record on appeal could support a finding that Sumita's long-term mental health condition is more deleterious to the children than Michael's history of DV, the trial court failed to make the required findings to support this conclusion. *Compare* RCW 26.09.191(3)(b) *and* -.191(2)(n). We will not stretch the trial court's words to manufacture an unstated finding. It is possible that the trial court determined that Michael did not pose a threat to the children and was more fit to parent than Sumita, however the trial court failed to make sufficient findings to support this conclusion.

Michael argues that the trial court did not err because setting of the car alarm and violating the no-contact order was an "isolated incident" and not a "history" of DV under RCW 26.09.191. Br. of Resp't at 10-11 (citing *In re Marriage of C.M.C.*, 87 Wn. App. 84, 88, 940

P.2d 669 (1997)). But we have no way of knowing whether trial court determined that Michael had a "history" of DV for the purposes of the statute or considered his past offenses "isolated" because of the inadequate findings entered by the trial court. Thus, his argument fails. Accordingly, because the trial court failed to follow the procedure for setting the parenting plan in RCW 26.09.191 as discussed above, and did not set forth any explicit findings as required by statute, we hold that the trial court abused its discretion.

### III. EXPERT REPORT

Sumita argues that the trial court erred when it excluded Dr. Rybicki's report and testimony. We consider this argument because it may recur on remand. We hold that the trial court did not err when it excluded Dr. Rybicki's report and testimony but that the trial court is free to reconsider whether Dr. Rybicki's report or testimony would be helpful on remand.

We review a trial court's evidentiary rulings for an abuse of discretion. *Wagner*, 18 Wn. App. 2d at 596. The trial court abuses its discretion if the decision is manifestly unreasonable or based on untenable grounds for untenable reasons. *Wagner*, 18 Wn. App. 2d at 596. Where a trial court excludes evidence in error, we need not reverse if the error was harmless, meaning that it did not affect the outcome of the trial. *Wagner*, 18 Wn. App. 2d at 596-97.

ER 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Expert testimony is admissible if (1) the witness qualifies as an expert, (2) the opinion is based on a generally accepted scientific theory, and (3) the expert testimony would be helpful to the trier of fact. *In re Pers. Restraint of Morris*, 176 Wn.2d 157, 168-69,

288 P.3d 1140 (2012). Expert testimony is helpful if it concerns matters beyond the common knowledge of an average layperson and is not misleading. *Carlton v. Vancouver Care LLC*, 155 Wn. App. 151, 161, 231 P.3d 1241 (2010). Courts generally interpret possible helpfulness to the trier of fact broadly and will favor admissibility in doubtful cases. *Driggs v. Howlett*, 193 Wn. App. 875, 905, 371 P.3d 61 (2016). However, where it is debatable whether the proffered testimony would be relevant and helpful to the trier of fact, it is not an abuse of discretion to exclude the evidence. *See State v. Cheatam*, 150 Wn.2d 626, 652, 81 P.3d 830 (2003).

Here the trial court excluded Dr. Rybicki's testimony because it found that the testimony would not be helpful and would be misleading:

> The court finds that Dr. Rybicki was only retained for a critique and work product review of the GAL . . . and [Sumita's] own mental health professionals Dr. Singer and Dr. Smetko. In this way he interferes with the responsibility of the fact finder to access expertise and credibility.
>
> . . . The court finds Dr. Rybicki has no expert opinions as to any material issue in this case. Therefore, his report and testimony would not be helpful to the court as the factfinder. ER 702, ER 401, ER 402, and ER 403.

CP at 352.

Sumita argues that because Dr. Rybicki is a psychologist, his testimony "would unquestionably have been helpful." Br. of Appellant at 12. But even Dr. Rybicki realized the limited helpfulness of his report and concluded with a caveat:

> None of the comments made here should be understood as diagnoses or clinical findings regarding any of the parties. None of these statements should be taken as case specific recommendations regarding best interest concerns or offering advice regarding custody or visitation.

CP at 73.

The primary issue here was the parenting plan. Dr. Rybicki offered nothing but critiques of the experts who examined Sumita. He did not examine Sumita or Michael and he conducted no interviews. Because Dr. Rybicki's report and testimony would have therefore been of debatable helpfulness to the finder of fact, it was within the trial court's discretion to exclude it. However, as explained above, because we remand the parenting plan to enter more robust findings of fact, the trial court has discretion to review whether to admit Dr. Rybicki's report or take testimony.

## IV. RELOCATION FACTORS

Sumita argues that the trial court erred when it granted Michael's request to relocate with the children and that its analysis of the relocation factors was incomplete and ignored the facts. Sumita presents a separate argument for each factor. Although we conclude that the trial court properly analyzed some of the factors, we hold that the trial court erred when it did not properly examine the relocation factors under RCW 26.09.520(1)—the relative strength of the children's relationship with each parent, (4)—whether Michael's time should be limited under RCW 26.09.191(2)(a), (8)—the availability of alternative arrangements, and (10)—the financial impact and logistics of the relocation.

RCW 26.09.520 provides that there is a rebuttable presumption that the intended relocation of the child will be permitted. *See also McNaught*, 189 Wn. App. at 553. "If a person entitled to residential time or visitation objects to a child's relocation, the person seeking to move the child may not relocate the child without court approval." *McNaught*, 189 Wn. App. at 553; RCW 26.09.480(2). "A person entitled to object to the intended relocation of the child may

24

rebut the presumption by demonstrating that the detrimental effect of the relocation outweighs the benefit of the change to the child and the relocating person." RCW 26.09.520.

As noted above, we review a trial court's decision on relocation for an abuse of discretion. *McNaught*, 189 Wn. App. at 552, 556. "A trial court abuses its discretion when it makes a manifestly unreasonable decision or bases its decision on untenable grounds or untenable reasons." *McNaught*, 189 Wn. App. at 552. The trial court is better positioned than appellate courts to weigh evidence and credibility in custody proceedings and we do not review those determinations. *In re Marriage of Chandola*, 180 Wn.2d 632, 650 n.5, 327 P.3d 644 (2014); *In re Marriage of Eklund*, 143 Wn. App. 207, 212, 177 P.3d 189 (2008).

RCW 26.09.520 provides the factors a court must consider when deciding on relocation. It provides, in pertinent part:

> The person proposing to relocate with the child shall provide his or her reasons for the intended relocation. There is a rebuttable presumption that the intended relocation of the child will be permitted. A person entitled to object to the intended relocation of the child may rebut the presumption by demonstrating that the detrimental effect of the relocation outweighs the benefit of the change to the child and the relocating person, based upon the following factors. The factors listed in this section are not weighted. No inference is to be drawn from the order in which the following factors are listed:
>
> (1) The relative strength, nature, quality, extent of involvement, and stability of the child's relationship with each parent, siblings, and other significant persons in the child's life;
>
> (2) Prior agreements of the parties;
>
> (3) Whether disrupting the contact between the child and the person seeking relocation would be more detrimental to the child than disrupting contact between the child and the person objecting to the relocation;
>
> (4) Whether either parent or a person entitled to residential time with the child is subject to limitations under RCW 26.09.191;

(5) The reasons of each person for seeking or opposing the relocation and the good faith of each of the parties in requesting or opposing the relocation;

(6) The age, developmental stage, and needs of the child, and the likely impact the relocation or its prevention will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child;

(7) The quality of life, resources, and opportunities available to the child and to the relocating party in the current and proposed geographic locations;

(8) The availability of alternative arrangements to foster and continue the child's relationship with and access to the other parent;

(9) The alternatives to relocation and whether it is feasible and desirable for the other party to relocate also; [and]

(10) The financial impact and logistics of the relocation or its prevention.

RCW 26.09.520.

The trial court must consider each factor to determine whether the detrimental effect of the relocation outweighs the benefit of the change to the child and the relocating parent. *McNaught*, 189 Wn. App. at 556. "A trial court abuses its discretion when it fails to consider each factor." *McNaught*, 189 Wn. App. at 556.

The trial court entered written findings on each factor in its final order and findings about the objection and petition to relocate with the children. Sumita argues that the court erred in its analysis of every one of these factors.

A.    *Relative Strength, Nature, Quality, Extent of Involvement, and Stability of the Child's Relationship with Each Parent*

Sumita argues that the trial court failed to make any findings on the relative strength of the children's relationship with each parent. We agree.

26

The trial court found:

> The children's relationships with each parent, any siblings, and other important people in the children's life have been impacted by [Sumita]'s mental health disturbances, beginning April 2014 after the birth of the parties' second son, and again beginning April 2019 after the birth of the parties' third son. [Michael] is seeking to return to the parties' former home in the Phoenix, Arizona area where the children will have closer relationships with paternal and maternal grandparents and with paternal aunts, uncles and cousins. This factor weighs in favor of relocation.

CP at 507.

Here the trial court did not properly consider the factor because it made no findings regarding the nature of Michael's relationship with the children. The court made no specific findings on Michael's involvement with the children, their stability with him, or the children's relationship with Michael relative to their relationship with Sumita. Accordingly, we hold the trial court abused its discretion.

B.    *Prior Agreements of the Parties*

Sumita argues that the court "sidestepped the statutory factor in favor of considerations that are outside the scope of this factor." Br. of Appellant at 23. However, she does not show that the court abused its discretion. The court found:

> There were not agreements between the relocating and objecting persons about moving with the children per say [*sic*], although both parties testified that they contemplated moving "home" to Phoenix in the future. [Sumita] testified she could not move as she has just re-entered the workforce and believes she would have trouble if she moved so soon after obtaining a very good position in her former field of property management. This factor very slightly weighs in favor of [Michael].

CP at 507.

27

Sumita argues that the trial court's analysis should have ended after the first clause of the sentence. But the court relied on testimony in the record regarding agreements on relocating that the parties made and weighed the credibility of the parties in making this finding. Thus, this is not an abuse of discretion.

Sumita then argues that even the court's statement that there were no agreements is erroneous because they had the temporary parenting plan in place during the pendency of this trial. But this ignores the plain language of RCW 26.09.191(5) which states, "In entering a permanent parenting plan, the court shall not draw any presumptions from the provisions of the temporary parenting plan." Sumita's argument fails.

C.     *Whether Disrupting Contact between the Children and the Person Seeking Relocation Would Be More Detrimental to the Children Than Disrupting Contact Between the Children and the Person Objecting to the Relocation*

Sumita argues the court's analysis under this factor was "tortured" and that the court did not focus on the correct evidence in the record. Br. of Appellant at 24-27. Although the trial court's findings on this factor were not a model of clarity, the court did make the finding that disrupting the children's contact with Michael would not be more harmful to them than disrupting their contact with Sumita. Sumita's arguments exclusively go to the weight the court placed on evidence in the record and accordingly fail.

D.     *Whether Either Parent Is Subject To Limitations under RCW 26.09.191*

Sumita argues that the trial court erred when it ignored Michael's history of DV when it entered this finding. We agree.

The trial court found:

> The current parenting/custody order decided in connection herewith, includes two limitations under RCW 26.09.191 on [Sumita] for long term physical condition of her mental health and for her continuous use of alcohol despite a history of DUI, intensive alcohol treatment and mental health concerns which include [Sumita]'s inability to understand a mental health trigger for her is belief that she can safely use alcohol. This factor weighs heavily in favor of relocation.

CP at 508.

This finding suggests that the court found that Sumita had restrictions on her residential time based on RCW 26.09.191. However, as explained above, this is unclear from the cursory findings in the parenting plan. Moreover, here the trial court again failed to enter findings on whether Michael's time should be limited under RCW 26.09.191(2)(a) or otherwise expressly find his history of DV to not be impactful under RCW 26.09.191(2)(n). Accordingly, we cannot affirm the relocation order for the same reason we cannot affirm the parenting plan. Because the trial court did not apply the mandatory standard under the statute, we hold that it abused its discretion when analyzing this factor.

E.      *The Reasons of Each Person for Seeking or Opposing the Relocation and the Good Faith of Each of the Parties in Requesting or Opposing the Relocation*

Sumita argues that the trial court erred when it found that the reasons Michael gave for moving were given in good faith. Her argument appears to be based entirely on the court's

analysis of Michael's credibility.[11]  Accordingly, we do not review the trial court's

determination.

F.      *The Age, Developmental Stage, and Needs of the Children, and the Likely Impact the*

*Relocation or its Prevention Will Have on the Children's Physical, Educational, and Emotional*

*Development, Taking into Consideration Any Special Needs of the Children*

Sumita again argues that the trial court did not address this factor.  But the court made

extensive findings:

> Preventing the move would affect the children's physical, educational, and emotional development, considering their age, developmental stage, and needs (including any special needs) as follows:
>
> If move is allowed, the children will have additional resources not only from [Michael]'s promotion but also from extended family as caregivers and support. [Sumita]'s participation would be by her testimony be limited to half time which would cause the children to deal with two household and potentially two different sets of caregivers, one set in each household while each parent worked.  This would be difficult for [DG] whose special IEP needs are better served by consistency not a week on and week off schedule absent the parents living in very close proximity. During covid if schools for the older two boys were not in person, a split plan could work, but due to the distance between the parties' residences, one parent could not reasonably bring the children to school and still timely attend to his or her work duties.  This factor weighs for [Michael]'s move.

---

[11] The trial court found:

> e. Reasons for moving: *Findings:* There is no dispute but that reasons for moving were given in good faith.  [Michael] anticipates a promotion at work that will involve more travel than presently.  He has ascertained that this situation will exacerbate current challenges of working while being a primary parent of three children.  He desires to move to obtain extended family support for his children.
>
> f. Reasons for objecting: *Findings:* The reasons for objecting to the move were given in good faith.

CP at 508.  To the extent that Sumita argues that she did dispute that Michael's reasons for moving were in good faith this argument also fails.  She makes no showing that she argued bad faith below and fails to cite to the record that she made any such argument.

CP at 508. These findings clearly align with the statute. The court considered the special needs of the children, took into account their education, and discussed family resources available should the move occur.

Far from showing that the trial court abused its discretion in making these findings, Sumita instead appears to argue that we should replace the trial court's reasoning with her own. We decline. Her argument fails.

G.    *The Quality of Life, Resources, and Opportunities Available to the Child and to the Relocating Party in the Current and Proposed Geographic Locations*

Here Sumita again argues that the trial court focused on the wrong evidence when making its findings. The trial court stated: "Phoenix and Seattle and surrounds are comparable. Neither outweighs the other." CP at 509. Although these findings are not extensive, they adequately address the factor regarding the two geographic locations. Sumita's remaining arguments go to the weight the court gave certain evidence and we do not consider them.

H.    *The Availability of Alternative Arrangements to Foster and Continue the Children's Relationship With and Access to the Other Parent*

Sumita argues here that "the trial court barely made any findings that were so vague as to be meaningless." Br. of Appellant at 38. On this factor the court found, "There would be arrangements available as Phoenix and Seattle and surrounds have same amenities in communication and in travel availability." CP at 509. The trial court did not discuss how the children moving to Arizona would impact their access to Sumita if she remains in Washington, nor did it enter any findings as to fostering the children's relationship with and access to each parent. Indeed, the findings say nothing regarding the relationship with the other parent should

31

the relocation take place or not. Accordingly, the court did not enter sufficient findings relevant to the statutory factor. This was an abuse of discretion.

I.    *The Alternatives to Relocation and Whether It is Feasible and Desirable for the Other Party to Relocate Also*

Sumita argues that it is not feasible for her to move to Arizona. Here the trial court found, "[Sumita] indicates moving to Phoenix was in future plans and the inability she perceives to her move now are temporary in scope. [Sumita] had a career in property management in the Phoenix area. This weighs slightly in favor of the move." CP at 509. Sumita makes no showing as to why it was not feasible and reaches outside the record to argue that Michael has better opportunities in Washington. This argument fails.

J.    *The Financial Impact and Logistics of the Relocation or Its Prevention*

Finally, Sumita again argues that the trial court ignored the factor and considered facts extraneous to the factor. We agree.

The trial court found:

The court can devise a plan to give [Sumita] significant time with the children before [Michael] moves, helping them re-establish[] a relationship that was interrupted for about fourteen months. The court can also devise a plan for significant visits approximating the desired half time, whether [Sumita] is within the same school district, from one to five hours distant or long distance.

CP at 509.

Although the court states that it can devise plans to address logistical problems in the future, it did not directly analyze the logistics of this relocation or address potential financial impacts to the parties. Because the court did not analyze this factor, we hold that it abused its discretion.

32

Accordingly, on remand the trial court must address the relocation factors under RCW 26.09.520(1), (4), (8), and (10), for which we hold it abused its discretion. The court must enter appropriate findings for the factors it did not properly consider, re-weigh the factors, and apply them with the presumption of relocation under RCW 26.09.520.

## V.  SOLE DECISION-MAKING AUTHORITY

Sumita argues that the trial court erred when it named Michael the sole decision-maker for the children in the parenting plan. We agree that the trial court did not enter appropriate findings to reach its conclusion that Michael should be sole decision-maker.

RCW 26.09.187(2) provides, in pertinent part:

(b) SOLE DECISION-MAKING AUTHORITY. The court shall order sole decision-making to one parent when it finds that:

(i) A limitation on the other parent's decision-making authority is mandated by RCW 26.09.191.

As explained above, the trial court did not enter adequate findings on whether Michael's residential time should be limited under RCW 26.09.191. Accordingly, the trial court failed to follow the statutory mandate when awarding sole decision-making to Michael. On remand, the trial court must follow the procedure for determining sole decision-making as set forth above based on further fact finding under RCW 26.09.191.

## VI.  MINORS DECIDING RESIDENTIAL TIME

Sumita then argues that the trial court erred when it allowed the children to decide how to exercise certain aspects of their residential time on reaching age 14. But Sumita and Michael agreed to this arrangement and we will not consider her argument on appeal.

"Under the invited error doctrine, a party may not set up an error at trial and then complain of it on appeal. The doctrine applies when a party takes affirmative and voluntary action that induces the trial court to take an action that party later challenges on appeal." *Fowler v. Fowler*, 8 Wn. App. 2d 225, 243, 439 P.3d 701 (2019) (quoting *Grange Ins. Ass'n v. Roberts*, 179 Wn. App. 739, 774, 320 P.3d 77 (2013) (internal quotation marks and citation omitted)). To determine whether this doctrine applies, we consider "'whether the defendant affirmatively assented to the error, materially contributed to it, or benefited from it.'" *In re Dependency of A.L.K.*, 196 Wn.2d 686, 695, 478 P.3d 63 (2020) (quoting *In re Pers. Restraint of Coggin*, 182 Wn.2d 115, 119, 340 P.3d 810 (2014) (plurality opinion)).

Here the parties agreed to allow the children to make some decisions regarding residential time for themselves as they mature. The court ruled that, depending on how far from the children Sumita lives, on reaching 14 years old, each child may choose to skip weekends or holidays with Sumita "that interfere with the child's extracurricular activities or peer friendship plans." CP at 479. At trial, the court asked the parties if they agreed that "the children make their own decisions as they mature. Does that work for everybody?" VRP (July 30, 2020) at 527. To this, both parties responded in the affirmative and the court stated, "Everybody is nodding positive." VRP (July 30, 2020) at 527. Thus, Sumita assented to the provision. Accordingly, she may not raise this argument on appeal and we do not consider it.

## VII. CONTEMPT

Sumita argues that the trial court erred when it denied her motion to hold Michael in contempt for violating the temporary parenting plan. We disagree.

"If, based on all the facts and circumstances, the court finds after hearing that the parent, in bad faith, has not complied with the order establishing residential provisions for the child, the court shall find the parent in contempt of court." RCW 26.09.160(2)(b). We review a trial court's decision on a motion for contempt for an abuse of discretion. *In re Marriage of Williams*, 156 Wn. App. 22, 27, 232 P.3d 573 (2010). "A court abuses its discretion by exercising it on untenable grounds or for untenable reasons." *Williams*, 156 Wn. App. at 27. A parent seeking a contempt order must establish the contemnor's bad faith by a preponderance of the evidence. *Williams*, 156 Wn. App. at 28. "In a contempt case the trial court balances competing documentary evidence, resolves conflicts, weighs credibility, and ultimately makes determinations regarding bad faith." *Williams*, 156 Wn. App. at 28. We do not review credibility determinations on appeal. *Eklund*, 143 Wn. App. at 212.

Here it is undisputed that Michael failed to deliver the children to Sumita under the terms of the temporary parenting plan for the planned July 11, 2020 exchange. However, the trial court found that Michael did not act in bad faith because "he acted to protect his children and his rights not to be set up for a violation." CP at 602.

The court heard testimony from Gallup, who agreed to assist in exchanging the children in violation of the temporary parenting plan. Gallup testified that he went to the exchange location but did not see Michael, so he texted him. Michael responded, "Who is this?" VRP (July 29, 2020) at 149.

Michael testified that he did not take the children to the location because in the past, Sumita had called the police on him over 22 times in order to get him arrested for a violation of the no-contact order. He further testified that Sumita had appeared in person at the two prior

exchanges, despite the February order modifying the temporary parenting plan that required each parent to use a third party to exchange the children. Michael testified that he did not know who Gallup was. Michael testified that he therefore did not want to take the children to where Sumita might be to give her the opportunity to call police on him: "I'm not going to just walk into a trap to get arrested. Thank you." VRP (July 30, 2020) at 438.

This evidence in the record supports the trial court's determination that Michael did not act in bad faith. Sumita argues that Michael "pretend[ed] to not know" who Gallup was or why Gallup was texting. Br. of Appellant at 47-48. But Sumita's argument hinges on Michael's credibility. Because we do not review credibility determinations, her argument fails.

## ATTORNEY FEES

Sumita argues that we should award her attorney fees on appeal under RCW 26.09.140. We decline to award fees here.

RCW 26.09.140 allows us to award attorney fees only "after considering the financial resources of both parties." Here, each party submitted a financial declaration. However, although Sumita shows some need, it is not evident that Michael has the ability to pay. Accordingly, we do not award attorney fees.

## CONCLUSION

We hold that the evidence does not support the finding that Michael did not have DV history under RCW 26.09.191, and the trial court did not properly consider this history for purposes of the parenting plan. However, we recognize that reversing the parenting plan and relocation order without some stopgap measure would be harmful to the children—assuming they have since relocated with Michael to Arizona after the August, 2020, relocation order.

36

Accordingly, we convert the existing parenting plan, child support order, and relocation order, to temporary orders until the trial court enters new temporary or final orders.

Next, we hold that the trial court did not abuse its discretion when it excluded Dr. Rybicki's report and testimony. We further hold that the trial court did not properly consider the limitations under RCW 26.09.191 as required when considering relocation under RCW 26.09.520(4). Likewise, we hold that the trial court did not properly consider RCW 26.09.191 when it awarded Michael sole decision-making. However, Sumita agreed to allow the children to make decisions on residential time as they matured and we will not review invited error.

Furthermore, we recognize that only the judge who heard the evidence at trial can make findings of fact. *Tacoma Recycling, Inc. v. Capital Material Handling Co.*, 42 Wn. App. 439, 442, 711 P.2d 388 (1985). A successor judge may enter only conclusions of law, and may enter findings of fact only during a new trial. *Tacoma Recycling*, 42 Wn. App. at 440, 442. Accordingly, if Judge Nelson hears this case on remand, we instruct the court to enter explicit findings on Michael's and Sumita's respective residential time as required under RCW 26.09.191(2)(a), (2)(n), and (3)(b). We instruct the court to review the relocation factors and enter appropriate findings for the factors it did not properly consider under RCW 26.09.520(1), (4), (8), and (10). After it enters appropriate findings under RCW 26.09.191, we instruct the court to enter appropriate findings as to sole decision-maker status under RCW 26.09.187(2)(b), which requires the court consider its findings under section .191.

If a new judge hears this case on remand, then the trial court must conduct a new trial. We instruct any new judge to conduct the new trial on the facts and circumstances as they exist at the time of trial.

Finally, we hold that the trial court did not abuse its discretion when it found Michael did not act in bad faith when he violated the temporary parenting plan. We do not award Sumita attorney fees on appeal.

Accordingly, we affirm in part and remand the parenting plan and relocation order to the trial court with the above instructions to follow the procedure for setting the parenting plan in RCW 26.09.191, and set forth any explicit findings as required by statute.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Worswick, J.

We concur:

Maxa, J.

Glasgow, A.C.J.